**EXHIBIT 10**

## AFFIDAVIT OF JULIUS S. PIVER, M.D.

1.  I am a board certified Obstetrician and Gynecologist and have been engaged in the practice of Obstetrics and Gynecology since 1956. I am a member of the American College of OB/GYN and the American College of Gynecological Laparoscopists. A true and correct copy of my Curriculum Vitae is attached as Exhibit 1.

2.  I am familiar with the standard of care and the usual and ordinary practice of Obstetrics and Gynecology in the United States in major population centers from the 1960s to date. I gained this familiarity from my schooling at George Washington University where I graduated in 1952 and during my residency in OB/GYN at Columbia Hospital for Women. 1953-1956. I have been qualified as an expert of the standard of care in OB/GYN in the courts of 28 different states on many occasions. where I testified both for plaintiffs and defendants.

3.  In addition to my education and training, I am familiar with the literature and labeling of DES as well as other pharmaceuticals used in obstetrics and gynecology over the last 50 years. I gained this familiarity from exchanging information regarding the care and treatment of OB/GYN patients with other physicians at conferences, meetings. seminars, and symposiums attended by OB/GYNs from all over America. In the early 1970's, there was a national standard of care regarding the use of synthetic estrogens during pregnancy where indicated.

4.  Quite often out-of-town OB/GYNs would come to Washington from all over America for symposiums. lectures and meetings where we would confer and exchange views regarding the practice of OB/GYN including diagnoses and treatment of fertility issues and pregnancy.

5.  In 1956 I began prescribing DES to my patients for prevention of the accidents of pregnancy. In fact. I prescribed DES to my wife when she was pregnant with our daughter. The term DES means Diethylstilbestrol and not any other synthetic estrogen.

EXHIBIT 10

6.  From the time I began prescribing DES to my patients I was familiar with the educational and promotional labeling of publications promulgated by Eli Lilly concerning DES. This included the manufacturer's brochure, the Physicians Desk Reference (PDR).

7.  Attached as Exhibit 2 are selected pages from the 1969 PDR, which lists Lilly as the only Diethylstilbestrol manufacturer entry on page 224 and 819. The specific entry contains no warning as to any teratogenic effect. For nearly two decades from the 1950's to the late 1960's, diethylstilbestrol was recommended for treating accidents of pregnancy in 25mg to 100mg daily. The information contained in this 1964 PDR entry attached as Exhibit 2 was the commonly accepted and guiding informational labeling regarding DES until the date it was banned for pregnant women in 1971.

8.  I have reviewed the attached as Exhibit 3, which are true and correct selected pages from the Eli Lilly DES manufacturer's brochure that recommends the regimen and dosage of DES for use in accidents of pregnancy. The information contained therein was widespread and accepted by the OB/GYNs in major population centers in the U.S. This include the manufacturers' brochures and the Physicians Desk Reference. Lilly had recommended the use of DES in pregnancy for twenty years as safe and effective.

9.  The national standard of care in 1970 was to prescribed DES in accordance with the Lilly labeling which contained neither warning of any injury to the fetus, nor any contraindication in pregnancy.

10. The most widely employed means and methods for gleaning current information as to the risks of pharmaceuticals available to an OB/GYN in the field was the PDR. The PDR was the primary source in conjunction with the pharmaceutical manufacturers' detail representatives and "Dear Doctor" letters. These were the primary sources for current information or updates as to the warnings, contraindications and risks of their pharmaceuticals. Had Lilly contraindicated or warned in their labeling, literature, or a "Dear Doctor" letter of any serious or permanent risks to the daughter *in utero*, it would have been a departure from the standard of care for all OB/GYN doctors to ignore such warnings.

11. I have reviewed and attach as Exhibit 4 selected pages from a publication entitled <u>De Re Medica</u>, which was promulgated by Eli Lilly and distributed to the physicians of America in 1951. This

2

publication recommends the use of DES in pregnancy as <u>the most effective</u> agent to prevent the accidents of pregnancy.

12. In the 1970's, Eli Lilly was known as the primary manufacturer and distributor of DES and was considered by the OB/GYN community to be the most reliable source of information regarding DES.

13. It was the customary ordinary and usual practice of OB/GYNs in major population centers in the U.S. in the 1970's to read, rely upon, and heed the Lilly literature. "Dear Doctor" letters, company detail men and PDR entries regarding the specific risks of *in utero* DES exposure.

14. Attached as Exhibit 5 is a warning that should have been issued regarding DES based on the state of the art as it then existed. Had Eli Lilly issued a similar warning of serious injury to the exposed daughter, it would have been a departure from the standard of care for an obstetrician to prescribe DES to a pregnant woman.

I declare under penalty of perjury that the foregoing is true and correct and that this Declaration was executed on 1ˢᵗ day of February, 2006, at Bethesda, Maryland.

_____
Julius S. Piver, MD

3